IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES | * |
| | * |
| | *   Criminal No. 19-263-DLF |
| v. | * |
| | * |
| ANTHONY ALLEN MORRISON | * |
| | * |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

COMES NOW, Anthony Morrison, by and through his attorneys, Michael E. Lawlor, and Nicholas G. Madiou, Brennan, McKenna & Lawlor, Chtd., and respectfully submits this memorandum in support of the arguments to be presented by the Defendant at the time of sentencing.

### Introduction

This memorandum focuses on Mr. Morrison's background -- including exposure to extreme trauma and significant mental health concerns such as mental retardation, his acceptance of responsibility, and hopes for the future. Mr. Morrison comes before the Court with an unspeakably tragic upbringing filled with physical, psychological and sexual abuse, and incredibly serious mental health concerns, which calls for a below guidelines sentence.

As the United States Probation Office appropriately recognizes, there are mitigating factors in this case that warrant a downward variance. Mr. Morrison respectfully asks this Honorable Court to consider this information when fashioning an appropriate sentence of 60 months of incarceration, the mandatory minimum term of incarceration in this case.

### Procedural History

The United States of America charged Anthony Morrison with distribution of child

1

pornography, in violation of 18 U.S.C. § 2252(a)(2). Mr. Morrison was arrested on March 13, 2019, during which time he cooperated with law enforcement, acknowledging that he in fact downloaded and viewed child pornography as well as shared that content through a bit torrent program. Mr. Morrison was detained pending trial, and has remained incarcerated since March 13, 2019.

On August 27, 2019, Mr. Morrison appeared before this Honorable Court and pleaded guilty to distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2).

Sentencing is currently scheduled for June 24, 2020. At the time of sentencing, Mr. Morrison will have served one year, three months, and 11 days of incarceration in this case.

## **Guideline Considerations**

### Guideline Calculations under Plea Agreement

According to the plea agreement, the base offense level for this offense is 22, pursuant to U.S.S.G. § 2G2.2(a)(2). Two levels are added because the offense involved prepubescent minors, (U.S.S.G. § 2G2.2(b)(2)), two levels are added because Mr. Morrison knowingly engaged in distribution, (U.S.S.G. § 2G2.2(b)(3)(F)), and two levels are added based on the use of a computer (U.S.S.G. § 2G2.2(b)(6)). The parties further agree that five levels are added because the offense involved 600 or more images, pursuant to U.S.S.G. § 2G2.2(b)(7)(D)), resulting in an adjusted offense level of 33.

In light of his acceptance of responsibility and timely notification of his intention to plead guilty pursuant to USSG § 3E1.1(a) and (b), Mr. Morrison receives a downward adjustment of three levels. Therefore, the parties agree that the total adjusted offense level applicable to Count One is 30.

Mr. Morrison comes before the Court with a total of zero criminal history points, resulting in a criminal history category of I. Based on a criminal history category I, and a total offense level of 30, the advisory sentencing guidelines range applicable in this case is 97 to 121 months of imprisonment.

## Guideline Calculations under the PSR

The parties come before the Court having agreed to a guidelines calculation that is materially different from the range presented in the presentence investigation report ("PSR"). In addition to the calculations presented above, the PSR author assesses a four-level increase based on the offense involving material portraying sadistic or masochistic conduct. PSR, at ¶27. Based on this addition, and a total offense level of 34, the PSR calculated Mr. Morrison's advisory sentencing guideline range as 151-188 months of imprisonment. PSR, at ¶99.

In addition to the calculations above, the PSR suggests that a downward departure under USSG § 5H1.3 is appropriate in this case. In support of this suggestion, the PSR states:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. Additionally, a downward departure may be appropriate in certain cases to accomplish a specific treatment purpose. Mental and emotional health conditions may also be relevant in determining specific conditions of supervised release. In this case, the defendant has been diagnosed with Bipolar Disorder, ADHD, Tourette's Syndrome, and Mild Mental Retardation. He is considered disabled and has received disability services most of his life.

PSR, at ¶ 126.

While Mr. Morrison is bound under the plea agreement not to advocate for a downward departure, he asks this Court to consider the PSR's determination that such a departure is warranted under USSG § 5H1.3 and impose a variant sentence of 60 months under Section 3553(a).

## PSR Objections

Mr. Morrison objected in writing to the PSR's addition of four levels pursuant to USSG §2G2.2(b)(4). *See* ECF No. 24. At this time, Mr. Morrison respectfully incorporates and adopts those arguments presented to the Court here. Mr. Morrison respectfully asks this Court to adopt the guidelines range as presented by the parties in Mr. Morrison's plea agreement. The Government did not seek to prove in Mr. Morrison's plea those facts presented in the PSR to support the four-level enhancement under USSG §2G2.2(b)(4). Likewise, Mr. Morrison did not agree to the facts relief on by the PST to support a §2G2.2(b)(4) enhancement. For these reasons, Mr. Morrison should not receive a four-level upward adjustment pursuant to USSG §2G2.2(b)(4).

## **A Reasonable Sentence in this Case**

The United States Supreme Court highlighted in *Pepper v. United States*, 562 U.S. 476 (2011), that the cornerstone of federal sentencing is to "consider every convicted person as an individual and every case as a unique study in the human failings that

sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 487 (internal quotation marks omitted). That process is embodied in the sentencing system instituted by the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005).

In *Booker*, the Supreme Court held that the mandatory nature of the United States Sentencing Guidelines—particularly 18 U.S.C. Section 3553(b)(1), which purported to make the Guidelines mandatory upon federal courts—was unconstitutional. The Court struck the mandatory language of the statute and held that, although a sentencing court shall consult the guidelines in fashioning a sentence, the court is permitted to "tailor the sentence in light of other statutory concerns as well" with reference to the factors outlined in Section 3553(a). *Id.* at 245.

The core requirement of Section 3553(a) is that the Court impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in Section 3553(a)(2). Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the guideline range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense; to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence; to protect the public from future crimes and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. Courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the Guidelines, so long as the ultimate sentence is *reasonable* and carefully supported by reasons tied to the factors enumerated

in Section 3553(a).

Consistent with the principle of individualized sentencing is the wide discretion afforded the sentencing judge "in the sources and types of evidence used to assist in determining the kind and extent of punishment to be imposed," in particular, "the fullest information possible concerning the defendant's life and characteristics." *Pepper*, 562 U.S. at 477 ("[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant").

<u>Mr. Morrison's Upbringing & History of Trauma</u>

Anthony Morrison comes before the Court at the age of 33. He respectfully asks this Court to consider his history and characteristics when imposing a just and reasonable sentence in this case. Specifically, Mr. Morrison asks this Court to consider his history of and exposure to extreme violence, as well as sexual, physical and emotional abuse, when sentencing him to the mandatory minimum term of incarceration in this case.

Anthony Morrison was born on June 1, 1988 in Washington D.C. He has no memory of his biological parents, and he was adopted at the age of 3 by Ronald and Deborah Morrison. There is a 30 year age difference between his adoptive mother and father. Ronald is now in his 80's, while Deborah is in her 50's.

Mr. Morrison suffered horrific adversities while growing up.  Throughout his upbringing, Anthony was physically and emotionally abused by his adoptive parents. This abuse was so pervasive, Anthony has spent the majority of his life trying to block out the memories of this trauma. He does recall both parents punishing him with extreme violence

6

in response to almost any transgression. As described in the PSR, Anthony recalls instances where his parents slammed him to the floor and hit him with hard objects as a form of punishment.

As a result of this abuse, Anthony developed mental health and behavioral issues early on in life. Anthony was placed in various residential placements where he resided for a large part of his adolescence. There Anthony "was subjected to physical, emotional, and sexual abuse while in these various placements." PSR at ¶ 44.

As science catches up with an increasingly complex combination of societal impacts on development, we now understand that there are significant neurobiological consequences to experiencing traumatic stress as a child and adolescent.  For example, the Corpus Callossum integrates the right and left side of the brain.  It is smaller in those who have experienced childhood trauma, which causes difficulty in language and behavior. *See The Biological Effects of Childhood Trauma*, Michael D. De Bellis, MD, Child Adolescent Psychiatry Clinics of North America. published online February 16, 2014.  Those affected often have trouble resolving conflicts with words and with other problem-solving techniques.

Those who have suffered childhood trauma are often also vulnerable to mental health problems due to difficulty in learning from past experiences. *Id.* Those with traumatized brains experience faster fear, anxiety, nervousness and hyper-vigilance. Individuals who experienced trauma like Mr. Morrison also have smaller, less active Frontal Lobes, which help people predict behavioral consequences, control impulses and organize daily life.  The frontal lobes are not fully developed until between the ages of 24-

26. In those who have been traumatized, the underdevelopment combined with trauma impairs one's ability to weigh consequences and control emotions. This can be especially problematic for a person deciding quickly what to do in response to a perceived threat. These are biological differences that manifest in the brains of children who have been exposed to trauma. We are only now beginning to realize the science of how our environs shape our brains and future.

While Mr. Morrison has endured much physical and emotional pain growing up he is hopeful for a brighter future. Despite not having received the treatment that is needed thus far, Mr. Morrison prays that he may take advantage of such treatment in the future. For these reasons, Mr. Morrison respectfully asks this Court to consider his significant history of trauma and impose a variant sentence in this case that requires mental health treatment while incarcerated and upon supervised release.

## Additional Mental Health Concerns

It is not surprising, given the traumatic upbringing detailed here, that Mr. Morrison has a history of unaddressed mental health and substance abuse concerns. As reflected in the PSR, Anthony experienced mental health issues from a very early age. He reported being hospitalized at Children's Hospital as a child for hallucinations. Before reaching adulthood, Anthony was twice committed to the Psychiatric Institute of Washington ("PIW") in Washington, D.C.

> Mr. Morrison stated he saw a number of different psychiatrists during his childhood and that he was diagnosed with Tourette's Syndrome, a learning disability, Bipolar Disorder, and with Mild Mental Retardation. He also said he received treatment for an "unusual sexual problem" after being accused

8

of "touching boys" by school officials. He stated he was prescribed Ritalin at the age of 5 and, later on, he was prescribed medications including Zyprexa, Seroquel, Depakote, and Abilify. He stated he never consistently took his medications.

PSR, at ¶ 59.

During the PSR interview Mr. Morrison had incredible difficulty discussing many of the painful memories of the physical and sexual abuse he endured as a child, describing the memories as "unbearable." PSR, at 61. In addition, the unthinkable abuse he suffered at home and during residential placements, Anthony was bullied through his schooling.

Mr. Morrison also has a history of inflicting physical injuries upon himself as a child. He recalls" banging his head against the wall or himself until his nose bled." PSR. at ¶ 60. The PSR also reflects an incident where Anthony was hospitalized after severely injuring himself by impaling himself anally. Mr. Morrison has a history of suicidal ideation and attempts. At the age of 20, Anthony ingested an entire bottle of Depakote causing him to have his stomach pumped at Greater Southeast Hospital in Washington, D.C. Shortly after this episode, Anthony overdosed on his mental health medication.

> [Anthony] reported being hospitalized twice at Howard University Hospital (HUH) in the District of Columbia between 2014 and 2015 after admitting himself through the hospital's emergency room due to mental crises. He characterized these episodes as "emotional outbursts" which culminated in him "tearing up [his] apartment." He indicated he spent two to three weeks in the hospital psychiatric ward on at least one of these occasions.

PSR, at ¶ 67.

Mental health records indicate that Anthony has been diagnosed with "ADHD, Bipolar Disorder, and Mild Mental Retardation." PSR, at ¶ 70. Anthony is disabled, and clearly in need of sustained mental health treat. Pending sentencing, Anthony underwent a

9

psychosexual and mental health examination from December 5, 2019 to March 6, 2020 at the Bureau of Prisons. Anthony's mental health evaluation suggested that he "has a motivation for treatment and that he indicated a positive attitude towards the possibility of change." PSR, at ¶ 71h.  The evaluation also concluded that Anthony presents a low risk for a contact sexual offense. Despite his tortured history, Mr. Morrison is ready to embrace long-lasting and meaningful treatment.

As noted above, the PSR author believes it appropriate for this Court to grant a downward departure based on Mr. Morrison's mental and emotional conditions. Mr. Morrison presents this history to support his request for a sentence to the mandatory minimum term of incarceration in this case.

<u>Conditions of Confinement & The COVID-19 Pandemic</u>

The Court will sentence Mr. Morrison at a time of global anxiety and uncertainty. The COVID-19 pandemic has touched every person on the planet and its toll will be felt long after a vaccine is discovered. Nowhere is the anxiety and risk as great as it is for incarcerated persons. The global pandemic is not a neutral fact at Mr. Morrison's sentencing; it is directly relevant to 18 U.S.C. §3553(a)(1)'s instruction that the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." Mr. Morrison's contened incarceration during the pandemic is relevant factor weighing heavily in favor of a variant sentence.

Mr. Morrison has had an extremely difficult time while incarcerated at the DC Jail. This period of incarceration represents Anthony's first period of time behind bars. At times, his time behind bars has been too much for him to endure. Physically, he stands five feet,

nine inches, and weighs 160 pounds. He is largely unable to defend himself, and he is often picked on and physically assaulted for no reason at all.

In meeting with Mr. Morrison while incarcerated, the undersigned have witnessed the effects of intimidation surrounding Mr. Morrison. Over the course of more than a year, Mr. Morrison has become adept at simply getting through each day. He has shared with counsel his experiences of being targeted as weak, and routinely having his commissary stolen. As a result, Mr. Morrison rarely feels safe while incarcerated, and has had significant difficulty sleeping.

Mr. Morrison respectfully asks this Court to consider his conditions of confinement when imposing a just sentence in this case.

<u>A Variance is Appropriate Where, As Here, USSG § 2G2.2 Produces a Sentencing Range That Is Greater Than Necessary</u>

The guidelines for child pornography offenses set forth in U.S.S.G. § 2G2.2 were not based on empirical evidence and do not result in recommended sentences that would serve the purposes of sentencing. Sentencing courts may vary from the Guidelines based on policy disagreements alone. *Spears v. United States*, 555 U.S. 261, 267 (2009); *Kimbrough v. United States*, 552 U.S. 85, 101-02 (2007) (courts may vary from Guidelines ranges based solely on disagreements with the Guidelines); *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect ' 3553(a) considerations"). This Court may properly find that because the child pornography guidelines were not developed by the Sentencing Commission based on empirical data and national experience, it is not likely that the guidelines "reflect a rough

approximation of sentences that might achieve ' 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109-10.

Numerous courts have approved policy-based variances from § 2G2.2. *See United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011) ("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*."); *United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (finding district court did not abuse discretion by imposing policy-based downward variance from § 2G2.2); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (finding *Kimbrough*'s holding that "it was not an abuse of discretion" for a district court to disagree with the crack guidelines "because those particular Guidelines 'do not exemplify the Commission's exercise of its characteristic institutional role' . . . applies with full force to § 2G2.2."); *United States v. Stone*, 575 F.3d 83, 89-90 (1st Cir. 2009) (same, noting district court may choose to agree with Congress's policy decisions as long as it recognizes its authority not to, but the child pornography "guidelines at issue are in our judgment harsher than necessary").

Numerous courts in this district have varied from the child pornography guidelines, in large part based on these same policy considerations. *See, e.g., United States v. Malakoff*, 09-cr-0051 (ESH) (finding that child pornography guidelines not entitled to usual deference and sentencing 47-year-old defendant to five years' probation for possession of "profoundly disturbing" videos, based upon the other § 3553 factors,

including lack of criminal record, childhood sexual trauma, punishment inflicted by the conviction and sex offender registration requirement, and defendant's deep roots in the community).

The Sentencing Commission itself has acknowledged that § 2G2.2 is not the product of "empirical data and national experience" but instead a response to the creation of mandatory minimum sentences and specific congressional directives. *United States Sentencing Commission, Fifteen Years of Guideline Sentencing*, at 73 (Nov. 2004) ("frequent mandatory minimum legislation and specific directives to the Commission to amend the Guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress"); *see also United States v. Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wisc. 2008) ("To the extent that the advisory guidelines deserve continued respect from courts, that respect will be greatest where the Commission has satisfied its institutional role of relying on evidence and study to develop sound sentencing practices. [§ 2G2.2] simply does not represent that role, as the Commission itself has acknowledged."); *Baird*, 580 F. Supp. 2d at 892 ("when Guidelines are not the result of 'the Commission's exercise of its characteristic institutional role,' such as when they are not based on an empirical approach, but are instead keyed to or guided by statutory directives, a court is not presented with an 'ordinary case,' in which 'the Commission's recommendation of a sentencing range will reflect a rough approximation of the sentences that might achieve' 3553(a)'s objectives'"); *United States v. Johnson,* 588 F. Supp. 2d 997, 1004 (S.D. Iowa 2008) ("because the [§ 2G2.2 guidelines] do not reflect the unique institutional strengths of the Sentencing Commission in that they

are not based on study, empirical research, and data, the Court . . . affords them less deference that it would to empirically-grounded guidelines").

Both district court judges and legal commentators have described § 2G2.2 as "seriously" flawed not only because § 2G2.2 was promulgated in a manner inconsistent with the approved practices of the Sentencing Commission, but also because § 2G2.2 does not adequately reflect important distinctions in levels of culpability among defendants. Unwarranted increases have occurred in the context of both the base offense levels and specific offense characteristics. Many of the specific offense characteristics in § 2G2.2, such as the enhancement for "number of images" (which adds up to 5 levels to the Offense Level), were enacted without any "research, study or rationale." *Hanson*, 561 F. Supp. 2d at 1010.

While many subsections of § 2G2.2 were promulgated with little or no empirical analysis, other subsections continue to be applied notwithstanding the fact that they do not address the concerns sought to be addressed by § 2G2.2. Here, for example, the two level specific offense characteristic enhancement for the "use of a computer," § 2G2.2(b)(6), was designed to fight the wide dissemination and instantaneous transmission in computer-assisted trafficking of child pornography, combat the increased difficulty of investigation and prosecution by law enforcement officials, minimize the increased likelihood that child pornography will be viewed by and harm children, and limit the potential for pedophiles to lure children into sexual relations through the computer. Yet, the enhancement is applied in almost every case. That is not what Congress intended.

Section 2G2.2 has also been repeatedly criticized because of its numerous other

14

specific offense characteristics that are rarely case-specific or unique, but instead present in almost every case, including § 2G2.2(b)(2) (images containing children under twelve, a 2 level increase); § 2G2.2(b)(7) (multiple images, up to a 5 level increase); and § 2G2.2(b)(4) (material that portrays sadistic or masochistic conduct, a 4 level increase).

The sentencing scheme under § 2G2.2 therefore not only destroys the distinction between "true peddlers of child pornography and more simple possessors or transporters," *Hanson,* 561 F. Supp. 2d at 1009, but it also fails "to adequately reflect those important distinctions in levels of culpability" among defendants sentenced for violations of 18 U.S.C. § 2252A. *Baird*, 580 F. Supp. 2d at 895.

The Sentencing Commission has also recognized the flaws in § 2G2.2. In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines. *See* U.S. Sentencing Commission, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Pornography Report*"]. The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," *id.* at iii, xi, the guideline

15

"fail[s] to differentiate among offenders in terms of their culpability." *Id.* at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (e.g., the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23.

Technology has changed the nature of this offense. In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas

16

today, images of child pornography are available for free with no planning and minimal effort. As a result, much less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously. Before widespread dissemination on the Internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it.

In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer. *See* U.S. Sent'g Comm'n, *Report to the Congress: Sex Crimes Against Children* 29 (1996) [U.S. Sent'g Comm'n, *1996 Report*]. In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer. U.S. Sent'g Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011); U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.17.

The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been committed. *See* Andreas Frei et al., *Pedophilia on the Internet⸺A Study of 33 Convicted Offenders in the Canton of Lucerne*, 135 Swiss Med. Weekly 488, 492 (2005); *see also* Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43, 44 (2009); L. Webb et al., *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 450 (2007). The change in technology is relevant, in part, because even as the population of child pornography offenders has become less dangerous, punishment has

17

greatly increased.  *See* Richard Wollert, PhD, *The Implication of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to the U.S. Sentencing Commission* at 4-5 (Feb. 15, 2012).

According to the Commission, "technological changes have resulted in . . . ready accessibility of child pornography," including graphic sexual images of very young victims, which "previously [were] not widely circulated." *Child Pornography Report* at 6. Now that the "typical" child pornography case involves images depicting "prepubescent children engaging in sexually explicit conduct," *id.* at 84, the current guideline "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors" and is "overly severe for some offenders in view of the nature of their collecting behavior," *id.* at 322-23.

USSG § 2G2.2 does not reflect the Sentencing Commission's unique role of relying on evidence and study to develop sound sentencing practices, and produces advisory sentencing ranges that are far greater than necessary to serve the statutory purposes of federal sentencing. It is for these reasons that courts throughout the country, and in this district, accord § 2G2.2 minimal deference.  Mr. Morrison urges this Court to consider these arguments and adopt the same approach when sentencing him.

## Conclusion

As Anthony Morrison awaits sentencing before this Honorable Court, he asks the Court to consider his mental health conditions, his acceptance of responsibility, as well as his tortured history of physical sexual and emotional abuse, and exposure to significant trauma. While not an excuse, Mr. Morrison's history of severe abuse, as well as his mental

18

retardation, put his offense conduct in its relevant context. Mr. Morrison is not the typical offender.

Viewing Mr. Morrison as a typical offender, the Government asks this Court to impose a bottom-of-the-guidelines sentence of 97 months. However, Mr. Morrison does not fit the mold of an otherwise normal "law-abiding citizen, with education, work histories, and supportive families." USA Sntg. Memo, at 11. In many ways the challenges Anthony Morrison has faced were more than he could overcome. Without the proper support and treatment, it is both unspeakably sad as well as unsurprising that he appears now before this Court. Mr. Morrison respectfully asks for leniency in recognition of the unique and tragic circumstances of this case and his life. As reflected in the BOP evaluation, Mr. Morrison presents a low risk for a contact sexual offense. For all of these reasons, and those presented throughout this memorandum, counsel respectfully asks this Court to impose the mandatory minimum sentence of 60 months of incarceration. Such a sentence is sufficient but not greater than necessary to achieve justice here.

Respectfully submitted,

s/_____
Michael E. Lawlor
Nicholas G. Madiou
Brennan McKenna & Lawlor, chtd.
6305 Ivy Lane
Suite 700
Greenbelt, Maryland  20770
301.474.0044

## CERTIFICATES OF SERVICE

I HEREBY CERTIFY that on this 15th day of June, 2020, a copy of the foregoing Memorandum in Aid of Sentencing was delivered via ECF to the Office of the United States Attorney for this District of Columbia.

                                                s/_____
                                                Michael E. Lawlor